J-S71002-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 907 EDA 2016 |

Appeal from the Order February 29, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000582-2013,
CP-51-DP-0000448-2013

| | | |
|---|---|---|
| IN THE INTEREST OF: B.H., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: S.G., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 909 EDA 2016 |

Appeal from the Order February 29, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000581-2013,
CP-51-DP-0000189-2012

J-S71002-16

IN THE INTEREST OF: J.H., A     :    IN THE SUPERIOR COURT OF
MINOR                           :        PENNSYLVANIA
                                         :
                                         :
APPEAL OF: S.G., MOTHER       :
                                         :
                                         :
                                         :
                                         :     No. 910 EDA 2016

Appeal from the Order February 29, 2016
In the Court of Common Pleas of Philadelphia County
Family Court at No(s): CP-51-AP-0000580-2013,
CP-51-DP-0000159-2012

BEFORE: BOWES, PANELLA, and FITZGERALD*, JJ.

MEMORANDUM BY BOWES, J.:            **FILED NOVEMBER 08, 2016**

      S.G. ("Mother") appeals from the February 29, 2016 decrees involuntarily terminating her parental rights to her two sons, J.H. and J.G., and her daughter, B.H.[1] We affirm.[2]

      B.H. was born during September 2001 to Mother and Father. That relationship also produced J.H. during June 2005. J.G. was born of the relationship during February 2013, after the Philadelphia Department of

---

* Former Justice specially assigned to the Superior Court.

[1] On the same date, the trial court involuntarily terminated the parental rights of E.H. ("Father"), the biological father of all three children. We address Father's appeals separately.

[2] Mother also appealed the trial court order changing the children's permanency goals from reunification to adoption; however, she subsequently abandoned those claims in her brief.

- 2 -

Human Services ("DHS") became involved with the family. J.H. suffers from cerebral palsy and is wheelchair bound. He is deaf, and, since he depends on a gastronomy tube for nourishment, he is unable to feed himself.

DHS's first interaction occurred on January 8, 2012 in response to an emergency protective service report. The subsequent investigation revealed that Mother abused drugs, and that she and Father were not taking J.H. to his medical appointments. DHS also learned that J.H. and B.H. were chronically truant from school, and that Mother had insufficient food in her home.

On February 7, 2012, the trial court adjudicated J.H. and B.H. dependent. The children were placed in foster care on February 9, 2012. During February 2013, DHS discovered that Mother had given birth to J.G., and that both Mother and J.G. had tested positive for cocaine. Upon discharge from the hospital, J.G. was placed in his current pre-adoptive foster care with B.H. He was adjudicated dependent on March 12, 2013.

The initial permanency goal for all of the children was reunification. In furtherance of that goal the court directed Mother to participate in the following services: (1) attend the Achieving Reunification Center ("ARC") for a mental health referral and for parenting classes; (2) complete drug and alcohol treatment; (3) complete a parenting capacity evaluation; (4) attend regular visitations with J.H., B.H., and J.G.; (5) accompany J.H. to his medical appointments; and (6) obtain appropriate housing.

Mother's compliance with her Family Service Plan ("FSP") goals was minimal. She disappeared for months at a time, was uncooperative with the children's safety plan, and as of J.G.'s birth, she continued to abuse cocaine. Additionally, Mother was found noncompliant with all her FSP goals during the permanency review hearings during March and June 2013. Mother was dismissed from ARC due to non-attendance, she failed to attend the parenting evaluation, and she neglected to visit her infant son after his discharge from the hospital.

On October 11, 2013, DHS filed a petition for the involuntary termination of Mother's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). During a four-day hearing, the trial court heard testimony from the DHS caseworker, Charles Younger; the Children's Choice caseworker who supervised Mother's visitations, Jill Danhour; the Community Umbrella Agency ("CUA") caseworker, Leticia Jones; the Child Advocate social worker, James Cosby; and Mother.

On February 29, 2016, the trial court involuntarily terminated Mother's parental rights. Mother timely filed notices of appeal and concise statements of errors complained of on appeal, which this Court consolidated *sua sponte*. On June 2, 2016, the trial court filed its Rule 1925(a) opinion.

On appeal, Mother presents the following issues for our review:

A. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights where such determination was not supported by clear and convincing evidence under . . . 23 Pa.C.S.A. § 2511(a)(1), (a)(2), (a)(5),

(a)(8) as [M]other made progress towards working [on] and meeting her FSP goals, namely staying drug-free, working towards obtaining housing, working on parenting skills, and other goals during [J.H.'s, B.H.'s, and J.G.'s] placement?

B. Whether the trial court committed reversible error when it involuntarily terminated [M]other's parental rights without giving the primary consideration to the effect that the termination would have on the developmental[,] physical[,] and emotional needs of [J.H., B.H., and J.G.] as required by . . . 23 Pa.C.S.A. § 2511(b)?

Mother's brief at 5.

Our standard of review is as follows:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis.

Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in

the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

We need only agree with the trial court as to any one subsection of § 2511(a), as well as § 2511(b), in order to affirm. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we conclude that the certified record supports the trial court's decision to terminate under § 2511(a)(2) and (b), which provides as follows.

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . . .
>
>> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not

consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2), (b).

To terminate parental rights pursuant to § 2511(a)(2), the petitioner must produce clear and convincing evidence regarding the following elements: (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. *See In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003).

This Court has explained that, "[t]he grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002) (citations omitted). Parents are required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. *Id*. at 340. A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous. *Id*.

The crux of Mother's first argument is that DHS did not prove by clear and convincing evidence that "the conditions and causes of the incapacity,

abuse, neglect or refusal cannot or will not be remedied." 23 Pa.C.S. § 2511(a)(2). Mother asserts that she made "efforts to remain close to her children and [complete] her objectives, [which] exhibited that she was eradicating any repeated [neglect] that caused them to be placed in foster care." Mother's brief at 9. Further, Mother asserts that she "has demonstrated her commitment to maintain sobriety which is the main reason that brought the children into the custody of DHS." *Id*. In short, Mother argues, "DHS has not proved that she could not remedy such conditions." *Id*. We disagree.

The certified record belies Mother's assertions. Charles Younger was the DHS caseworker assigned to this family since March of 2012, about one month after DHS became involved. He testified that Mother missed an excessive number of medical appointments that she was required to attend with J.H. N.T., 8/20/14, at 51. Mother confirmed her failures in this regard during her direct examination. She indicated that it had been one year since she last went to a medical appointment with J.H. N.T., 10/17/15, at 11. Mother's failure to care for her son is undeniable. Indeed, Mr. Younger opined that, as of the date of the hearing, J.H. could not be safely reunified with Mother. N.T., 8/20/14, at 45.

With respect to Mother's continued drug abuse, Mr. Younger testified that, after J.G. was born with cocaine in his system, Mother acknowledged that she needed help with her drug addiction. *Id*. at 33-34. Although he

referred Mother for dual diagnoses services at the Clinical Evaluation Unit ("CEU"), she never attended. *Id*. at 35. While Mother reported being in drug and alcohol treatment on two separate occasions, one inpatient and the other outpatient, she failed to provide any documentation to verify that she completed either treatment program. *Id*. at 36-37. As such, Mr. Younger concluded that Mother failed to satisfy the requirement that she obtain services for her drug addiction. *Id*. at 37. Even after DHS initiated the termination proceedings on October 11, 2013, Mother continued to abuse drugs. The CUA caseworker, Leticia Jones, testified during the evidentiary hearing that in January 2016, Mother gave birth to a fourth child who was born with symptoms of withdrawal from cocaine. N.T., 2/29/16, at 70. While that child is not a subject of this appeal, the testimony gives lie to Mother's claim that she addressed her drug addiction.

As it relates to the remaining aspects of Mother's FSP goals, Mr. Younger testified that DHS referred Mother on three occasions for a parenting capacity evaluation, but she never complied. *Id*. at 37-38. Likewise, DHS referred Mother on three occasions to ARC for the purpose of assisting her to obtain employment, housing, parenting skills, and a mental health evaluation. N.T., 8/20/14, at 28-31. Mother never provided documentation that she completed any ARC services. *Id*. at 30. Indeed, after DHS made the second referral, ARC closed the file due to Mother's nonparticipation. The third referral has remained open since 2014. *Id*. at

31. As such, Mr. Younger concluded that Mother never completed ARC services. *Id*. at 31-32.

With respect to the housing component, Mr. Younger explained that Mother was transient throughout the history of this case. *Id*. at 50-51. He added that he assessed Mother's most recent home, and determined that it was too small to accommodate all three children. *Id*. at 51.

Mr. Younger also described Mother's abysmal record of attending the supervised visitations. DHS provided Mother two hours visitation with the children per week. *Id*. at 39. Since March of 2014, Mother has attended only eleven out of twenty visits. This rate of approximately fifty-percent attendance represents Mother's high-water mark over the history of the case. *Id*. at 54. Mr. Younger explained, "on several different occasions during the course of this case, I had not heard from [M]other in months." *Id*. at 29. Mr. Younger testified that he did not hear from Mother between June of 2012 and September of 2012, and then he did not have contact with her again until the birth of J.G. in February of 2013. *Id*. at 29, 39.

DHS also presented Jill Danhour, the caseworker from Children's Choice. Ms. Danhour supervised some of the visitations between Mother and the children. She testified that Mother attended 40% of the total visitations offered during the history of the case. N.T., 1/13/15, at 73. Specifically, she testified that Mother attended 60 out of 147 visitations. *Id*. at 89.

Based on the foregoing evidence, we discern no abuse of discretion by the trial court in terminating Mother's parental rights pursuant to § 2511(a)(2). Mother failed every component of the FSP and her progress toward completion was minimal. Moreover, her repeated and continued incapacity, neglect, or refusal to comply and/or complete the required services caused J.H., B.H., and J.G. to be without essential parental care, control, or subsistence necessary for their physical and mental well-being.

Further, we reject Mother's argument that the testimonial evidence is insufficient to demonstrate that the causes of the incapacity, neglect, or refusal cannot or will not be remedied. Mr. Younger testified that, "throughout the course of the case . . . we've had FSP goals in place and they haven't changed or deviated much." N.T., 8/20/14, at 45. He continued that, as of the date of the hearing, Mother's compliance with the required services was minimal. *Id*. at 44. In addition, Mother refused to acknowledge her role in the children's placement with DHS. We observe that Mother insists that J.H. and B.H. were placed due to "[a] false call . . . made to DHS" about neglect. N.T., 10/7/15, at 7. Similarly, she did not acknowledge any responsibility for the placement of J.G., which occurred at his birth in February of 2013 due to her cocaine abuse. In light of these facts and Mother's failure to comply with and/or complete any of the required services, her claims regarding § 2511(a)(2) are meritless.

In her second issue, Mother asserts that the trial court abused its discretion by failing to adequately consider "the emotional needs of the children because [she] continued to maintain a bond with her children while she was attempting to complete her reunification objectives. . . ." Mother's brief at 14. We disagree.

With respect to § 2511(b), this Court has explained that, "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.M.S.*, 884 A.2d 1284, 1287 (Pa.Super. 2005) (citation omitted). Further, the trial court "must also discern the nature and status of the parent-child bond, with utmost attention to the effect on the child of permanently severing that bond." *Id*. (citation omitted). However, "[i]n cases where there is no evidence of any bond between the parent and child, it is reasonable to infer that no bond exists. The extent of any bond analysis, therefore, necessarily depends on the circumstances of the particular case." *In re K.Z.S.*, 946 A.2d 753, 762-763 (Pa.Super. 2008) (citation omitted).

This Court has explained the needs and welfare analysis as follows:

> While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child. *In re K.K.R.S.*, 958 A.2d 529, 533-536 (Pa.Super. 2008). The mere existence of an emotional bond does not preclude the termination of parental rights. *See In re T.D.*, 949 A.2d 910 (Pa.Super. 2008) (trial court's decision to terminate parents' parental rights was affirmed where court balanced strong emotional bond against parents' inability to serve needs of

- 12 -

child). Rather, the orphans' court must examine the status of the bond to determine whether its termination "would destroy an existing, necessary and beneficial relationship." *In re Adoption of T.B.B.*, 835 A.2d 387, 397 (Pa.Super. 2003). As we explained in *In re A.S.*, 11 A.3d 473, 483 (Pa.Super. 2010),

> [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011).

Instantly, the trial court reasoned as follows:

> J.G. and B.H. reside in the same pre-adoptive home. They share their primary parental bond with the kinship parent. They both look to the kinship parent to meet their day to day needs. B.H. has stated that she no longer wants to visit with her biological parents. J.G. has never lived with his biological parents. J.H. resides in a pre-adoptive foster home. The foster mother has the appropriate medical training to care for the child. She is a registered nurse. J.H. is bonded to the foster mother. The foster mother is very attentive to J.H. and meets all of his medical needs. Furthermore, the children would not suffer permanent/irreparable harm if the parental rights of the parents were terminated.

Trial Court Opinion, 6/2/16, at unnumbered 6 (citations to record omitted).

Our review of the certified record supports the trial court's findings. First, we highlight that the testimony of Mr. Young and Ms. Danhour confirms the meaningful bond that the children share with their respective foster families. Now three-and-one-half-year old J.G. has been in pre-adoptive foster care since birth. Similarly, J.H. is bonded with his pre-

adoptive foster family, who provides the necessary attention and dedication to his special needs that Mother neglected to deliver. With respect to B.H., who was ten years old at the time of placement and fourteen years old when the termination hearings occurred, the record validates the child's desire to cease contact with Mother. James Cosby, the Child Advocate social worker assigned to B.H. since 2012, described how B.H. initially wanted to return to her parents but ultimately changed her mind and informed the agency that she did not want to continue attending supervised visitations with her parents any longer. *Id*. As such, B.H. has not seen Mother for more than one and one-half years. *Id*. at 22. Significantly, Mr. Cosby testified that B.H. has "been adamant about wanting to be adopted by [her foster mother]." *Id*. at 24.

Based on the foregoing evidence, we conclude that involuntarily terminating Mother's parental rights will serve the developmental, physical and emotional needs and welfare of B.H., J.H., and J.G. Therefore, we discern no abuse of discretion by the trial court in terminating Mother's parental rights pursuant to § 2511(b). Accordingly, we affirm the decrees involuntarily terminating her parental rights to the children and the orders changing the children's permanency goals from reunification to adoption.

Decrees affirmed. Orders affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/8/2016